IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Continental Casualty Company,                          Case No. 3:03CV7217

　　　　　Plaintiff

　　v.                                                               ORDER

Fifth/Third Bank,

　　　　　　　Defendant.

This is a subrogation claim by an insurance company, which paid a loss resulting from the defalcation of an agent, Samuel Balber, of Brooks Insurance Company, a Toledo, Ohio, insurance agency. Jurisdiction exists under 28 U.S.C. § 1332(a)(1).

Balber deposited more than $500,000 worth of premium payment checks into his personal account at defendant Fifth/Third Bank (5/3). The checks should have been deposited into the company's account. Brooks had a half-million dollar insurance policy with Continental Casualty Company (Continental) for employee dishonesty and fraud. After Balber's misconduct came to light, Continental paid Brooks on the policy, and Brooks assigned its rights against 5/3 to Continental.

Continental seeks to recover from 5/3 the $500,000 it paid Brooks. Fifth/Third defends by asserting, *inter alia*, statutory Uniform Commercial Code (UCC) defenses that place the liability for fraudulent checks not on the depository bank but on either 1) an employer who places a dishonest employee in a position of responsibility with regards to checks; or 2) a person whose negligence substantially contributes to the making of the forgeries. UCC §§ 3-405 (O.R.C. § 1303.47) (employee dishonesty); 3-406 (O.R.C. § 1303.49) (negligence substantially contributing to the making of a forgery).

1

Pending are cross motions for summary judgment and a motion by Continental to strike the deposition testimony of Dennis Johnson, Chief Executive Officer of Brooks. For the following reasons, Continental's motion for summary judgment is granted in regards to ten checks with missing or illegible endorsements and127 checks with restrictive endorsements. Otherwise, the motions are denied.

**Background**

Brooks is a Toledo-area insurance agency. Samuel Balber was a sales agent for Brooks. Brooks maintained its depository accounts at 5/3. Balber had an account at 5/3 in the name of "Samuel Balber Insurance."

Balber defrauded Brooks by taking 279 checks for insurance premiums, endorsing them, and depositing the funds into his 5/3 account. His misdeeds were discovered and he ultimately pleaded guilty to criminal charges of bank fraud on November 1, 2002. The U.S. District Court for the Northern District of Ohio sentenced Balber to a thirty-four month term of imprisonment. Balber was ordered to pay Brooks $698,115.52 in restitution, but has, thus far, not done so.

Balber endorsed 127 checks, totaling $215,301.19, "for deposit only." (Doc. 37 at 5). He endorsed 142 checks, totaling $320,682.96, with a "Brooks Insurance Agency" ink stamp and signed with the name of a deceased former Brooks employee, Rose Bodner.(*Id.*). Ten checks, totaling $17,758.68, had missing or illegible endorsements. (*Id.*).

This series of defalcations was not the first time Balber had taken customer payments and deposited them into his own account. In 1990, Balber's accounts included such a large number of receivables that Brooks's attorney contacted Balber about the problem. (Doc. 32 at 9). A Brooks

2

employee eventually was assigned the task of scrutinizing Balber's accounts in the future. (*Id.* at 9-10).

Around the time Brooks discovered the problems with Balber's accounts in 1990, Balber informed Brooks's Chief Executive Officer, Dennis Johnson, that he (Balber) had a substance abuse problem. In 1990, Balber paid Brooks $186,729.50 to resolve a receivable for one of his clients. Balber paid this amount with a check drawn on his own bank account, rather than with a check drawn on the client's bank account. As a result of that incident, Brooks officials told Balber he could not deposit premiums into his own account.

After Brooks learned around 1990 about Balber's substance abuse problem and high receivables, Balber ceased being a shareholder and officer with the agency.

Brooks's knowledge of prior misdeeds by Balber, 5/3 argues, shows Brooks negligently failed to take preventative measures to stop Balber from misappropriating funds again. Continental, on the other hand, argues that 5/3 exaggerates the significance of Balber's substance abuse problem and the severity of the earlier account irregularities.

This is a conversion claim, but both sides accuse each other of conduct that constitutes negligence or bad faith. Continental maintains that 5/3 grossly failed to follow reasonable banking practices by allowing Balber to deposit checks made out to Brooks into Balber's own account. Fifth/Third, on the contrary, insists Brooks negligently failed to monitor both Balber and its own accounts, thereby substantially contributing to the fraud.

The dispositive issue is which party should bear the loss from Balber's improprieties.

3

## Discussion

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In viewing the evidence, I must draw all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Best v. Cyrus*, 310 F.3d 932, 934 (6th Cir. 2002); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Bell v. Marinko*, 367 F.3d 588, 591 (6th Cir. 2004) (citing *Shah v. Deaconess Hosp.*, 355 F.3d 496, 498 (6th Cir. 2004)).

## I. Admissibility of Johnson Deposition

Fifth/Third seeks to support its motion for summary judgment with statements made by Dennis Johnson, Brooks's Chief Executive Officer. Johnson was deposed in a lawsuit which resulted from Balber's earlier defalcation, *Max Auto v. CNA Ins.*, Case No. C1-02-2856 (Lucas County Common Pleas Court). In that case, Max Auto (one of the customers whose premium money Balber stole) sued Brooks. Fifth/Third argues that Johnson's deposition shows that Brooks negligently failed to monitor Balber and customer accounts, which became delinquent when Balber pilfered the insurance payments.

In an affidavit filed in this case, Johnson explicitly references his prior deposition testimony. The Johnson deposition was attached to the affidavit as an exhibit. Rule 56 authorizes the use of

4

affidavits. Fed. R. Civ. P. 56(c). In a summary judgment proceeding, a court may consider a document that is attached to and authenticated by an affidavit given by a competent witness. Fed. R. Civ. P. 56(c); 11–56 *Moore's Federal Practice – Civil* § 56.14.

Continental argues the Johnson deposition is inadmissible because it violates Rule 32(a)(4) of the Federal Rules of Civil Procedure. Continental claims that deposition testimony from another case can be used only if the other action involved the same subject matter and the same parties. Only under such circumstances, according to Continental, does an adversary have adequate motive to cross-examine the deponent, and thus test the credibility and reliability of his testimony.

Continental misses the point. Johnson's affidavit in this case referenced the earlier deposition testimony, which even was included as an attachment. The affidavit therefore incorporated the deposition testimony. 11–56 *Moore's Federal Practice – Civil* § 56.14 ("A deposition, even if not admissible as a deposition, may under certain circumstances be admitted as an affidavit to the extent that it fulfills the requirements of an affidavit [. . .]"). Thus, I view the deposition testimony as part of the affidavit and deem it admissible in deciding the cross motions for summary judgment.

In any event, the admissibility or inadmissibility of Johnson's deposition does not affect the outcome of any of the issues raised by the cross motions for summary judgment. The deposition only contains information about Brooks that is already ascertainable from the record. Even without Johnson's deposition, evidence shows it took Brooks years to notice that Balber misappropriated several hundred checks totaling more than half a million dollars in customer insurance payments.

## I. Defenses to Subrogation

Fifth/Third raises several, independent defenses to Continental's ability to subrogate Brooks's claim. None has merit.

5

## A. Voluntary Payment Doctrine

Fifth/Third seeks to invoke the "voluntary payment doctrine" defense to subrogation by arguing that the law did not require Continental to pay Brooks on the employee dishonesty insurance policy. Thus, 5/3 argues, Continental is foreclosed from seeking to recover from 5/3 because: 1) Continental paid Brooks even though the insurance policy did not require payment, and 2) Continental should have resisted and legally challenged Brooks's demand for payment.

### 1. Balber Was an "Employee" Under the Policy

Fifth/Third first argues that Continental should not have paid Brooks because the policy covered "employee misappropriations" and Balber was an independent contractor, not an employee.

Continental insured Books under a policy that included commercial crime coverage. (Doc. 37 at 9; Ex. H). The policy defines "employee" as "any natural person [. . .] [w]hile in your service [. . .] [w]hom you compensate directly by salary, wages or commissions; and [w]hom you have the right to direct and control while performing services for you."

Balber, as a sales agent for Brooks, was subject to Brooks's policies and procedures. (Doc. 37 at 9-10). Brooks had the authority to direct and control Balber, who worked exclusively for Brooks. (Doc. 37 at 10). Brooks paid Balber commissions based on insurance policies sold. (*Id.*).

Fifth/Third points to Johnson's deposition testimony, in which he describes Balber as an independent contractor. That testimony does not help 5/3 because the policy's definition of "employee" controls, and Balber fits within the ambit of that definition as a person paid commissions and subject to the insured's direction and control.

6

### 2. Voluntary Payment Doctrine Inapplicable to Conventional Subrogation

The voluntary payment doctrine also does not apply because: 1) Continental's subrogation rights arise contractually and 2) Continental paid pursuant a legal obligation.

The Sixth Circuit has held that the voluntary payment rule does not apply to "conventional subrogation," which is subrogation that arises by contract or agreement. *Commercial Std. Ins. Co. v. Am. Employers, Ins. Co.*, 209 F.2d 60, 65 (6th Cir. 1954).

Even if the decision to pay a claim is legally or economically questionable, the "desire to preserve customer relations and avoid a complex and costly coverage litigation is still sufficient to prevent the [insurer] from being considered a mere volunteer." *Jorge v. Travelers Indem. Co.*, 947 F.Supp.150, 155 n.7 (D. N.J. 1996).

Public policy also weighs against permitting a "voluntary payment" defense in conventional subrogation cases. Insurers would always fight prompt payment of claims if their rights to subrogation were threatened unless they asserted every potential defense against insureds before paying. *Id.* at 156.

Forcing insurers to contest payment to insureds not only violates public policy, but such a requirement finds no support in case law. For example, subrogation is appropriate in situations even if it is later determined that a loss was not covered by a policy. *Bowling Green State Univ. v. Wyandot Constr., Inc.*, 1995 Ohio App. LEXIS 1048 (Ct. App.) (holding subrogation proper where insurer reimbursed insured for costs to clean up mercury spill that was later determined to not be covered by the policy).

Thus, the voluntary payment doctrine does not bar Continental's claim.

7

## B. Estoppel and Waiver

Fifth/Third also argues that the contract law doctrines of estoppel and waiver prevent subrogation.

Common law contract principles apply to insurance contracts. *Universal Underwritters Ins. Co. v. Shuff*, 67 Ohio St. 2d 172, 173 (1981). Ohio courts have applied estoppel and waiver to insurance contracts. *See generally Pedler v. Aetna Life Ins. Co.*, 23 Ohio St. 3d 7 (1986) (estoppel); *Hounshell v. Am. States Ins. Co.*, 67 Ohio St. 2d 427 (1981) (waiver).

Estoppel prohibits a party from asserting facts if the party's conduct induces another to change position in good faith reliance upon that conduct. *State ex rel. Cities Serv. v. Orteca*, 63 Ohio St. 2d 295, 299 (1980). Waiver is the voluntary relinquishment of a known right. *Gollings v. Nat'l Life Ins. Co.*, 92 Ohio App. 3d 726, 730 (1994).

Fifth/Third states that no Ohio cases addresses the issue of waiver and estoppel where the insurance company has waived its right to assert non-existence of coverage by paying a non-covered or questionable claim. Fifth/Third argues that normal principles of estoppel and waiver, as applied to the facts here, prevent Continental from recovering on its subrogation claim.

Contrary to 5/3's premise about the duty to contest Brooks's claim, Continental was not, as discussed above, required to decline or otherwise challenge coverage. Continental properly paid on its policy based on Balber's dishonest acts.

Second, 5/3 did not plead the affirmative defenses of waiver and estoppel in its answer, as is required by Rule 8(c). Fifth/Third thus waived these defenses. Fed. R. Civ. P. 8(c), 12(b); *Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818, 824 (6th Cir. 1990); *U.S. Fire Ins. v. City of Warren*, 176 F. Supp.2d 728, 730 (E.D. Mich. 2001).

Third, the facts, in any event, do not satisfy the elements of either waiver or estoppel. Waiver is inapplicable because 5/3 has not shown that Continental had the choice to either enforce or relinquish a known right. Because Continental acted properly in paying Brooks on the policy, it did not voluntarily relinquish a right to resist payment.

A defendant establishes the affirmative defense of estoppel by showing: 1) a representation by the party to be estopped; 2) that communicates a fact or state of affairs in a misleading way; 3) and induces reasonable, actual reliance by the second party; and 4) the party seeking estoppel would be prejudiced unless the other party is prevented from asserting a right in contradiction with the earlier representation. *Johnson v. City of Franklin*, 64 Ohio App.3d 205, 210 (Ct. App. 1989).

Fifth/Third, *inter alia*, has offered no evidence to show that either Continental or Brooks made misleading representations or that 5/3 relied on misrepresentations. Thus estoppel is inappropriate.

Fifth/Third cites numerous cases in which courts held that if a person whose endorsement is forged continues to deal with the forger after discovering the misdeeds, then that person is estopped from denying the forger's authority.

In this case, however, the evidence in the record of prior improprieties on Balber's part does not prove Brooks knew that Balber had forged the signature of Brooks officials. The full extent of Brooks's knowledge about Balber's earlier wrongdoing is, moreover, unclear. Fifth/Third has failed to satisfy the elements of estoppel and waiver.

## II. Defenses to Continental's Conversion Claim

Continental is suing 5/3 for conversion of the 279 checks which 5/3 permitted Balber to deposit in his own account. Under Ohio law, a bank is liable to a payee in conversion if the bank

takes a check for deposit that does not bear the authorized endorsement of the named payee or deposits a check in violation of a restrictive endorsement. O.R.C §§1303.60, 1303.26 (UCC §§ 3-420, 3-206). Continental is not suing under common law negligence. The defenses to a conversion claim are set forth in UCC § 3-405 (O.R.C. § 1303.47) (fraudulent endorsement by employee with responsibility for checks) and § 3-406 (O.R.C. § 1303.49) (negligence contributing to forged signatures).

### A. Section 3-405 – Employee Fraud

Section 3-405 (O.R.C. § 1303.47) covers situations involving a dishonest employee who forges his employer's signature. If triggered, §3-405 puts the liability for the employee's forgeries on the employer, and not the bank that deposited the fraudulent instruments. The facts of the case must satisfy all of § 3-405's elements for this provision to provide a defense to the bank.

To prevail under § 3-405 (O.R.C. § 1303.47) [i.e., to have the checks, even if fraudulently endorsed by Balber, treated as if they had been endorsed properly for Brooks's account], 5/3 must show: 1) it deposited the checks into Balber's account in good faith; and 2) Brooks entrusted Balber, its employee, with responsibility with respect to premium checks received by him.

If 5/3 makes this showing, the burden under § 3-405 (O.R.C. § 1303.47)  shifts to Continental to prove that the bank failed to exercise ordinary care and that its failure substantially contributed to the loss.

### 1. Bank Took Checks in Good faith

Fifth/Third cannot invoke the defenses of § 3-405 (fraudulent endorsement by an employee with responsibility for the instrument) or § 3-406 (negligence that contributed to a forged signature)

unless it took the checks from Balber "in good faith." UCC §§ 3-405(a)[1], 3-406(b) (O.R.C. §§ 1303.47, 1303.49) .

A finding of bad faith is warranted if a bank for an extended period of time and despite bank policies dictating otherwise permits a person to deposit stolen checks to an account that does not belong to the payee. *Pavex, Inc. v. York Fed. Sav. & Loan Assoc*., 716 A.2d 640 (Pa. App. 1998). According to Continental, courts find bad faith as a matter of law in such situations because corporations do not allow agents to deposit checks payable to the company into the agent's account. *See, e.g., Sheriff-Goslin v. Cawood*, 283 N.W.2d 691, 694 (Mich. App. Ct. 1979).

Continental also points to 5/3's own policy, which states that "[a]ny checks written to any form of a business entity should be deposited into an account with that business' name." (Doc. 48 at 13; Ex. B). Fifth/Third argues that it did not violate its policy because it did not deposit the checks into Balber's personal account, but into his business account.

Fifth/Third contends that the endorsements on the checks were such that tellers acted properly in depositing the money into the account for "Samuel Balber Insurance." The majority of checks bore endorsements invoking both Brooks's and Balber's authority.

I agree with Continental that the 5/3 policy language does not evidence the distinction 5/3 tries to make: namely, that depositing the checks into Balber's account was in accordance with bank policy and reasonable commercial standards because it was a business account. That 5/3 may have violated its own policies does not, however, end the matter.

---

[1]

Section 3-406 (O.R.C. § 1303.49), which concerns negligence that substantially contributed to the making of a forged signature, also requires the bank to have taken or paid the instrument in good faith. UCC § 3-406(b). I address the applicability of § 3-406 later in this opinion, but my analysis of whether 5/3 took the checks in good faith applies to that element in both § 3-405 and § 3-406..

Indeed, even if 5/3 acted negligently in depositing the checks into Balber's account, it does not automatically follow that 5/3 acted in bad faith. "[M]ere failure to follow commercially reasonable banking procedures or to comply with its own policies" does not *per se* equal bad faith. *Pavex, Inc.*, 716 A.2d at 645.

Bad faith is "a bank's conscious and deliberate decision to remain ignorant of the existence of a fraudulent scheme despite irregularities on the face of the transactions." *Id.* Additionally, " bad faith may properly be found where there has been either a gross violation of bank policies over an extended period and/or involving large sums, or a conscious and deliberate decision to ignore the existence of a fraudulent scheme." *Id.* at 646.

Fifth/Third's acts in this case occurred over a protracted period of time and involved numerous transactions for large sums. Ultimately, however, the evidence does not show that 5/3's failure to follow its own policies and banking procedures was great enough to constitute a gross violation. No evidence, furthermore, indicates that the bank's behavior resulted from deliberate decisions to ignore obvious fraud. Thus, 5/3 took the checks from Balber in good faith.

### 2. Entrusted With Responsibility for the Instruments

The next issue is whether Balber was an employee who was entrusted with responsibility for the instruments.

The term "responsibility" is defined by § 3-405 (O.R.C. § 1303.47).

> (3) "Responsibility" with respect to instruments means authority to do any of the following:
>
> > (a) To sign or indorse instruments on behalf of an employer;
> > (b) To process instruments received by the employer for bookkeeping purposes, for deposit to any account, or for other disposition;

> (c) To prepare or process instruments for issue in the name of the employer;
> (d) To supply information determining the names or addresses of payees of instruments to be issued in the name of the employer;
> (e) To control the disposition of instruments to be issued in the name of the employer;
> (f) To act otherwise with respect to instruments in a responsible capacity.
> "Responsibility" with respect to instruments does not include the authority that merely allows an employee to have access to instruments or blank or incomplete instrument forms that are being stored or transported or are part of incoming or outgoing mail, or similar access.

UCC § 3-405 (O.R.C. § 1303.47).

Continental maintains that Balber's job duties did not include "responsibility" for checks. According to Continental, Balber had no responsibility for processing, endorsing or depositing payments, which was handled exclusively by Brooks's accounting department. Checks from customers for premiums were to be made payable to Brooks and deposited in Brooks's checking account. Customers were to mail checks to Brooks, although sales agents could pick checks up from customers and then give those checks to the accounting department for processing.[2] In short, Continental argues Balber had none of the responsibilities outlined in subparagraphs (a) through (e) under § 3-405(a)(3).

Fifth/Third counters by arguing that Brooks turned a "blind-eye to violations of" the policy that its accounting department had exclusive responsibility to deposit checks made payable to the company. Fifth/Third contends Brooks entrusted Balber with responsibility for the checks because it failed to monitor receivables, invoice forms, and agents' banking and collection practices. The

---

[2]

Though Balber obtained checks directly from his customers (as did, on occasion, other agents working for Brooks), the record does not indicate exactly how Balber obtained the checks.

13

general theory of 5/3's argument is that while Brooks's written policies required customers to mail payments to Brooks, Balber's actual practices – as known and implicitly approved of by Brooks – included his receipt of premium payments and depositing them in the bank.

For the sake of argument, I shall assume the facts are as 5/3 alleges them. The question, then, is whether the fact that Brooks failed to monitor Balbler and implicitly approved of his practices (or implicitly granted him authority to deposit checks by allowing him to do so regularly) constitutes "responsibility" under § 3-405(3).

Fifth/Third supports its view of "responsibility" with an unpublished Third Circuit case, *Schrier Bros. v. Golub*, 123 Fed. Appx. 484 (3d Cir. 2005). The facts of that case are similar to those here. In *Schrier Brothers*, a sales agent for a janitorial supply company regularly received payment checks from customers. *Id*. at 487-89. The sales agent was to put checks from customers in a company lockbox. *Id.* at 488-89. Customers had the option of mailing checks to the company. *Id.* The Third Circuit held that the sales agent was an employee with responsibility for the checks. *Id.* at 488-89.

Likewise, in *Halla v. Norwest Bank Minnesota*, 601 N.W.2d 449, 452-53 (Minn. App. 1999), a real estate manager responsible for collecting rent on the employer's behalf was found to be an employee who was entrusted with responsibility for checks.

Continental correctly notes that I am not bound by the unpublished Third Circuit opinion. But Third Circuit opinions, even unpublished ones, are persuasive authority. The Minnesota decision in *Halla* also is persuasive authority.

14

In any event, Continental counters *Schrier Brothers* by arguing that the Third Circuit focused on the "'regularity' of the agent's practice of accepting checks from customers and his responsibility for sending the checks to the company's lockbox for deposit." 123 Fed. Appx. at 489.

Continental asserts that no evidence shows that Balber had continuing and regular access to either customer checks or check records. Continental insists that Balber was permitted to handle checks only when customers did not mail them to Brooks. Balber's authority, Continental argues, was limited to delivering checks to the accounting department.

In this case, a rational trier of fact could, however, find that Balber regularly accepted checks from customers. After all, he was able to get his hands on and negotiate 297 checks that should have gone into Brooks's account, rather than his. Even absent direct evidence of how Balber came to acquire the checks, a fair inference can be drawn that many, if not most or all of the 297 checks came directly to him, rather than passing through Brooks's normal channels.

The evidence shows, moreover, that Brooks permitted Balber (and other agents) to accept checks from customers, even if it did not regularly expect him to do so. The consequences of allowing such practice are not overcome by an internal policy stating that employees are not supposed to accept or handle checks. If an employer's practices regularly disregard it written policy, the practice trumps the written policy. Actions, a jury could find, spoke louder than words.

I conclude, accordingly, that whether Balber regularly accepted checks and whether such acceptance, under all the circumstances, caused him to have "responsibility" for the checks is a question for the jury to resolve.

15

### 3. Balber Made Forged Endorsements on Almost All Checks

The next element of § 3-405 (O.R.C. § 1303.47) requires that the employee make a fraudulent endorsement of the instrument. UCC § 3-405(b) (O.R.C. §1303.47(B)). The bank seeking to invoke § 3-405 has the burden of proving the checks were endorsed in the name of the person to whom it is payable. UCC § 3-405(b) (O.R.C. §1303.47(B)). "Fraudulent endorsement" is defined by U.C.C. § 3-405 (O.R.C. §1303.47(A)(2)) as "in the case of an instrument payable to the employer, a forged endorsement purporting to be that of the employer."

Checks are deemed forged if they bore an endorsement in the name of the payee or a name substantially similar to that name. *John Hancock Fin. Servs., Inc. v. Old Kent Bank*, 346 F.2d 727, 731 (6th Cir. 2003).[3]

Both § 3-405 and § 3-406 are not available defenses for 5/3, therefore, against Continental's conversion claim for the ten checks with missing or illegible endorsements. *Hartford Fire Ins. Co. v. Maryland Nat'l Bank*, 671 A.2d 22, 31 (Md. 1996); *see also Kraftsman Container Corp. v. U.S. Counties Trust, Co.*, 404 A.2d 1288, 1293 (N.J. 1979). A missing or illegible endorsement is neither in the name of the payee nor substantially similar to the name of the payee, and therefore not forged.

The other endorsements purported to invoke the name of "Brooks Insurance Agency." Some were endorsed, in addition to the Brooks Insurance Agency endorsement, "Samuel Balber Insurance."Additionally, some checks purported to be authorized by "Rose Bodner," Balber's

---

[3]
Section 3-406 also only applies to "forged" endorsements. The discussion here, therefore, is applicable to both defenses 5/3 seeks to raise.

deceased former secretary. Many of the checks signed in Bodner's name also bore an ink stamp that read, "Brooks Insurance Agency By" (with Bodner's name handwritten after the word, "by").

Continental claims the 142 checks endorsed by Bodner were not forged because 1) the ink stamp used was not the stamp officially used to endorse checks, and 2) Bodner, even when alive, was not authorized to endorse checks for Brooks. In short, Continental maintains that, for an endorsement to be forged, it must contain the actual signature of an authorized agent of Brooks.

Continental is incorrect. The proper test is whether the signature was in the name of the payee or substantially similar to that name. *John Hancock Fin. Servs., Inc.*, 346 F.2d at 731. The payee here is the business entity, Brooks Insurance Agency. I find the 142 signatures endorsed by Bodner and invoking Brooks's name were substantially similar to the name of the payee.

Indeed, the case cited by Continental, *John Hancock Fin. Servs., Inc. v. Old Kent Bank*, 185 F. Supp. 2d 771 (E.D. Mich. 2002), *aff'd*, 346 F.2d 727 (6th Cir. 2003), actually supports my conclusion here. First, the district court described the test for a forged signature in identical terms: a forged signature is one that is in the name of the payee or a substantially similar name. *Id.* at 778.

The facts of this case are clearly distinguishable, however, from *John Hancock*. In that case, an employee endorsed checks made out to John Hancock with a stamp reading "Sherman and Associates Financial Services." *Id.* at 774. "John Hancock" is not substantially similar to "Sherman and Associates Financial Services." *Id.* at 776 (noting that the name "Sherman and Associates Financial Services" "did not even resemble the name of the designated payee").

In this case, the 142 checks signed by Bodner were accompanied by a Brooks Insurance Agency ink stamp. The law does not require a perfect match, only substantial similarity.

17

The ink stamp used by Balber need not have been the same as that used by Brooks employees and the signatures need not have been in the name of an authorized Brooks agent. This is so because the payee here is not an individual, but a business entity. Such entity may, at any given moment, have multiple individuals authorized to endorse checks on its behalf. In such instances, the actual name of the person whose signature seeks to invoke the business entity's authority is less critical than the use of the entity's name to the determination that an endorsement was substantially similar to the name of the payee.

Thus the 142 checks purportedly signed by Bodner on behalf of Brooks were forged.

### 4. The Restrictive Endorsements on 127 Checks Bar a § 3-405 Defense

The fourth element of § 3-405 requires that "the endorsement [be] effective as the endorsement of the person to whom the instrument is payable.]" O.R.C. §1303.47(B) (UCC § 3-405(b)). This requirement does not excuse a bank from complying with restrictive endorsements on checks; a depository bank that pays a check inconsistently with a restrictive endorsement is liable to the payee in conversion. *Soc. Nat'l Bank v. Security Fed. Sav. & Loan*, 71 Ohio St. 3d 321, 324 (1994); O.R.C. §1303.26 (UCC § 3-206); *see also State of Qatar v. First Am. Bank of Virginia*, 880 F. Supp. 463, 471 (E.D. Va. 1995) (stating § 3-405 does permit bank to disregard restrictive endorsements).

Continental argues 5/3 violated the restrictive endorsements on 127 checks that were endorsed:

For deposit only
Brooks Ins. Agency
Samuel Balber Insurance

(Doc. 37 at 18-19).

18

The phrase "for deposit only" in an endorsement requires a bank to deposit the money into an account in the name of the person or entity listed immediately below those words. *Williams v. Liberty Bank & Trust Co.*, 746 So. 2d 275, 279 n. 4 (La. App. 1999).

Thus, the location of the phrase "for deposit only" – directly above "Brooks Ins. Agency" – required 5/3 to deposit the money into an account in the name of Brooks Insurance Agency. This reasoning is supported by a leading Uniform Commercial Code treatise. 2 White & Summers, Uniform Commercial Code § 16-7 (4th ed.)

The example given by White and Summers in this section is illustrative. In it, a business endorses a check with the inscription "for deposit only" followed by the name of the business. *Id.* A postal worker steals the check and endorses it in his name below both the phrase "for deposit only" and the endorsement in the name of the business. *Id.* A depository bank places the check in postal worker's account. *Id.* Under such circumstances, the business has a valid claim for conversion against depository bank for violating restrictive endorsement. *Id.* The bank, therefore, should have deposited the funds into account in name of business entity whose name immediately followed the restrictive endorsement "for deposit only." *Id.*; *see also Mid-Atlantic Tennis Courts, Inc. v. Citizens Bank & Trust Co. of Maryland*, 658 F. Supp. 140, 143 (D. Md. 1987) (defendant liable to plaintiff for breach of restrictive endorsement "for deposit only").

A bank has a duty to examine a restrictive endorsement, follow its directions, and therefore refuse to deposit funds into a particular account – or at least investigate the matter – if the restrictive endorsement so requires. *La Junta State Bank v. Travis*, 727 P.2d 48, 53-55 (Colo. 1986).

Ohio law, additionally, considers the phrase "for deposit only" to be a restrictive endorsement requiring deposit to the payee's account, regardless of whether an account number is designated. *Soc. Nat'l Bank*, 71 Ohio St. 3d at 324.

Here, Brooks was the entity named immediately below the restrictive endorsement "for deposit only." There is no evidence that 5/3 investigated the situation. The law required 5/3 to obey the restrictive endorsement and deposit the funds from the checks into Brooks's account. Summary judgment is warranted for Continental, therefore, with regard to the 127 checks that bore restrictive endorsements because § 3-405 does not protect a bank that violates such endorsements.

### 5. Whether 5/3 Failed to Exercise Ordinary Care

The fifth element of § 3-405 concerns whether the person paying or taking the instrument for value exercised ordinary care in so doing. UCC § 3-405(b) (O.R.C. §1303.47(B)). If the person who took the instrument for value did not exercise ordinary care, then comparative fault principles apply. O.R.C. §1303.47(B) (UCC § 3-405(b)).

The UCC defines "ordinary care" as "observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged." UCC § 3-103(7) (O.R.C. § 1303.01).

A bank fails to exercise ordinary care if it does not comply with reasonable commercial standards. *Continental Casualty v. Amer. Nat'l Bank*, 768 N.E.2d 352, 361 (Ill. App. 2002); *Govoni & Sons Const. Co., Inc. v. Mechanics Bank*, 742 N.E.2d 1094, 1103 (Mass. App. Ct. 2001). A bank's acceptance of corporate checks for deposit into an agent's account is commercially unreasonable. *Continental Casualty*, 768 N.E.2d at 367; *see also Martin Glenn v. First Fidelity*, 652 A.2d 199, 203-04 (N.J. Super. Ct. App. 1995) (bank violates reasonable commercial standards

20

where it accepts a corporate check for deposit into an agent's account); *Govoni & Sons Const., Inc.*, 742 N.E.2d at 1103 (same).

While normally the issue of negligence is for the trier of fact, courts have found certain egregious practices by banks to violate reasonable commercial standards as a matter of law. Examples of practices involving "clearly unreasonable conduct on the part of [a] bank" include: "payment of checks with missing [endorsements], failure to respect restrictive [endorsements], failure to inquire into the authority to sign of one purporting to be an agent, and allowing deposit of a check indorsed by a corporate payee into a personal account'" *Govoni & Sons Const. Co., Inc.*, 742 N.E.2d at 1103.

### i. Failure to Exercise Ordinary Care

Whether 5/3 exercised ordinary care here depends on how the checks were endorsed.

First, 5/3 failed to exercise ordinary care as a matter of law with regards to the checks bearing missing or illegible endorsements. *See Govoni & Sons Const. Co., Inc.*, 742 N.E.2d at 1103(taking check with missing endorsement is failure to exercise ordinary care as a matter of law). Depositing the ten checks lacking endorsements or bearing illegible endorsements into Balber's account, or any account for that matter, violated reasonable commercial practices.

Second, 5/3 failed to exercise ordinary care as a matter of law by violating the restrictive endorsements on 127 checks.[4] *See id.* (ignoring a restrictive endorsement equals failure to exercise ordinary care as a matter of law).

---

[4]

Not only is disregarding a restrictive endorsement commercially unreasonable, it also is a distinct grounds for liability. O.R.C. § 1303.26 (UCC § 3-206).

Third, the trier of fact will determine whether 5/3 failed to exercise reasonable care in taking the 142 checks with the endorsement of both Brooks (through Bodner) and Samuel Balber Insurance. These checks, importantly, did not have restrictive endorsements. This was also not a situation where Balber took checks made out to Brooks and signed only his own name on the back. Instead, the checks bore an endorsement purporting to invoke Brooks's authority. That fact is significant. A teller could have concluded that Brooks, through Bodner, negotiated the checks to Balber. A teller might also be faulted, however, for failing to enquire into the propriety of Balber's deposit of premium payment checks into his own account or Bodner's authority to negotiate checks (using the ink stamp) to Balber.

### ii. Comparative Fault

For the 142 checks without restrictive, missing, or illegible endorsements, the trier of fact must determine how the loss should be allocated under comparative fault principles. UCC § 3-405[5] (O.R.C. § 1303.47).

Section 3-405(b) states "the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss." UCC § 3-405(b) (O.R.C. § 1303.47(B)). A trier of fact could conclude that Brooks, by negligently failing to monitor Balber and its own accounts, should be allocated some of the fault for the forgeries.

---

[5] Section 3-406 also includes a reference to comparative fault. Section 3-406(b) states "the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss." UCC § 3-406(b) (O.R.C. 1303.49(B)).

Comparative fault does not apply to the checks with restrictive, missing, or illegible endorsements. Section 3-206, which states that a person paying or taking for value an instrument in violation of a restrictive endorsement is liable for conversion, does not contain comparative fault principles. Comparative fault is likewise not an issue for the ten checks with missing or illegible endorsements because, as mentioned earlier, § 3-405 and § 3-406 only apply to forged endorsements. A missing or illegible endorsement is not a forgery.

## B. Section 3-406 – Negligence Contributing to the Forgery

Section 3-406 reduces or absolves a party's liability for, *inter alia*, conversion claims if "[a] person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument." O.R.C. § 1303. 49(A) (UCC § 3-406(a)).

Section 3-406 reads:

> Negligence Contributing to Forged Signature or Alteration of Instrument
> (a) A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.
> (b) Under subsection (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.

        (c) Under subsection (a), the burden of proving the failure to exercise ordinary care is on the person asserting the preclusion. Under subsection (b), the burden of proving failure to exercise ordinary care is on the person precluded.

O.R.C. §1303.49 (UCC § 3-406).

Thus, if 1) a person fails to exercise ordinary care, and that failure 2) substantially contributes to the making of a 3) forged signature or alteration of an instrument, then the negligent party cannot assert the forgery against a person who paid the instrument in good faith.

First, 5/3 can only raise a § 3-406 defense for the 142 checks that did not bear restrictive, missing, or illegible endorsements.[6]

I addressed the third and forth elements earlier in this opinion because there were analogous elements of § 3-405. In short, the fraudulent endorsements Balber made on the 142 checks were forged signatures, and 5/3 took the checks in good faith.

The first issue is whether Brooks was negligent. I believe that there is sufficient evidence in the record for a jury to conclude that Brooks was negligent.

The second issue is whether the negligence "substantially contributed" to the making of the forgery. Again, a jury could determine that Brooks's negligence substantially contributed to the making and success of the forgeries.

According to Continental, negligent oversight does not, in itself, trigger § 3-406. True, the negligent conduct at issue must directly relate to the improper alterations of the checks. *See Bagby v. Merrill Lynch*, 491 F.2d 192, 197 (8th Cir. 1974) (finding that, although company was negligent in regards to certain transactions and the issuance of checks, such conduct did not allow a defense

---

[6] That is because, as mentioned earlier, 1) a missing or illegible endorsement is not forged and 2) violating a restrictive endorsement is an independent basis for liability under § 3-206.

under § 3-406 because the negligence only related to the issuance of the checks, not the forgery itself). A drawer's negligence in relation to hiring practices and check processing policies also does not afford banks a § 3-406 defense because such conduct does not relate to the specific manner and means of the misconduct at issue – the forgery. *See, e.g., Clean World v. MidAmerica*, 793 N.E.2d 110 (Ill. App. 2003); *Chicago Heights v. Par Steel*, 463 N.E.2d 829 (Ill. App. 1984) (negligent conduct must contribute to the forgery and failing to predict criminal conduct of a third party is not negligence substantially contributing to forgery).

Courts, however, have held that negligently failing to supervise an employee and/or monitor one's own accounts and business records substantially contributes to the making of a forged instrument. *See Menichini v. Grant*, 995 F.2d 1224, 1234 (3d Cir. 1993); *Mid-American Clean Water Sys. V. First Sav. Bank*, 159 B.R. 941, 946 (Bankr. D. Kan. 1993); *J. Gordon Neely Enterprises, Inc. v. Amer. Nat. Bank*, 403 So. 2d 887, 890-91 (Ala. 1981) ;*Oswald Mach. & Equip., Inc. v. Yip*, 10 Cal. App. 4th 1238, 1249 (Cal. Ct. App. 1992); *Westport Bank & Trust Co. Lodge*, 325 A.2d 222, 228 (Conn. 1973); *Hartford Accident & Indem. Co. v. Connecticut Bank & Trust Co.*, 476 A.2d 1083, 1086-87 (Conn. App. Ct. 1982); *Black v. Whitney Nat'l Bank*, 618 So. 2d 509, 516 (La. App. Ct. 1993); *Ashley-Hall Interiors, Ltd. v. Bank of New Orleans*, 389 So. 2d 850, 852-53 (La. Ct. App. 1980); *Gresham State Bank v. O & K Constr. Co.*, 370 P.2d 726, 733 (Or. 1962); *Thompson Maple Prods. Inc. v. Citizens Nat. Bank*, 234 A.2d 32, 35 (Pa. Super. Ct.1967); *West Penn. Admin., Inc. v. Union Nat. Bank*, 335 A.2d 725, 738 (Pa. Super. Ct. 1975); *Terry v. Puget Sound Nat'l Bank*, 492 P.2d 534, 535-36 (Wash. 1972).

Additionally, the Supreme Court of Oregon stated that the § 3-406 defense can apply "to cases where the party had notice that forgeries of his signature have occurred and is negligent in

25

failing to prevent further forgeries by the same person." *Fred Meyer, Inc. v. Temco Metal Prods. Co.*, 267 Or. 230, 235 (1973). That comment seems particularly applicable here in light of Balber's misdeeds dating back to 1990.

The inquiry, however, is fact-specific, so I decline to grant summary judgment for 5/3 on this issue and leave it to the trier of fact to determine both if Brooks was negligent and, if so, whether that negligence substantially contributed to the making of the forged instruments.

The record contains enough evidence for the trier of fact to reach both conclusions. Balber made his previous substance abuse problem known to Johnson. Brooks likewise was aware of Balber's prior misdeeds. Balber was able to pilfer almost 300 checks worth more than $500,000 over a three-year period without detection. It will be up to the jury to determine the legal consequences of his actions and Brooks's apparent inaction.

In general, Continental insists that "[n]egligence of the payee is not a defense to a conversion claim against a depository bank taking checks for collection bearing a forged instrument." *John Hancock Fin. Serv., Inc.*, 346 F.3d at 732-33. True, negligence of the payee is not a complete defense, but § 3-405(b) and § 3-406 contain comparative negligence principles. The facts here are, moreover, distinguishable on several grounds from *John Hancock*, which dealt with issues of Michigan law and an attempted § 3-406 defense.

First, § 3-406 (O.R.C. § 1303.49) only applies to forged endorsements. In *John Hancock*, the Sixth Circuit agreed with the district court that the endorsements at issue were not forged, thus making the rest of § 3-406 – which contains comparative fault language – inapplicable. *Id.* at 730-31. The endorsements at issue in this case, however, were forged.

26

Elsewhere in the *John Hancock* decision, the Sixth Circuit stated the comparative fault principles of the Michigan Tort Reform Act did not apply to a UCC-based conversion claim. *Id.* at 731-32. That holding does not apply here because there is no comparable tort reform act at issue.

Comparative fault, therefore, operates here to the extent § 3-405 and § 3-406 are triggered, which the trier of fact will decide.

### V. Summary: Final Analysis of Sections 3-405 and 3-406

Fifth/Third cannot invoke a § 3-405 (or § 3-406) defense with regards to the 127 checks with restrictive endorsements or ten checks with missing or illegible endorsements. Summary judgment in favor of Continental, therefore, is warranted for those 137 checks.

With regards to the 142 checks without restrictive endorsements, issues of regularity and responsibility, negligence, and comparative negligence issues are disputed, and for the trier of fact to resolve.

### Conclusion

It is therefore,

ORDERED that

1) Continental's motion to strike the Johnson deposition be, and the same hereby is, denied;

2) Continental's motion for summary judgment be, and the same hereby is, granted with respect to all checks with restrictive, missing, or illegible endorsements, but denied in all other respects;

3) Fifth/Third's motion for summary judgment be, and the same hereby is, denied.

4) A pretrial conference is scheduled for April 10, 2006 at 9:45 a.m.

So ordered.

27

/s/James G. Carr
James G. Carr
Chief Judge

28